<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

</div>

| | |
|---|---|
| **BRAMAN AUTOMOTIVE, INC., d/b/a**<br>**AUDI WEST PALM BEACH, and**<br><br>**PALM BEACH IMPORTS, INC., d/b/a**<br>**BRAMAN MOTORCARS, and**<br><br>**BRAMAN COLORADO EUROPEAN**<br>**IMPORTS, INC., d/b/a PRESTIGE AUDI,**<br><br>Plaintiffs,<br><br>- against –<br><br>**VOLKSWAGEN AG, and**<br>**VOLKSWAGEN GROUP OF AMERICA,**<br>**INC., d/b/a AUDI OF AMERICA, INC., and**<br>**AUDI AG,**<br><br>Defendants. | **Case No. _____** |

<div align="center">

**COMPLAINT**

</div>

Plaintiffs Braman Automotive, Inc., d/b/a "Audi West Palm Beach" and Palm Beach Imports, Inc., d/b/a "Braman Motorcars" (collectively "WPB"), and Braman Colorado European Imports, Inc., d/b/a "Prestige Audi" ("Prestige") (WPB and Prestige together referenced herein as "Braman" or "Plaintiffs"), file this lawsuit against Volkswagen AG ("VWAG"), Volkswagen Group of America, Inc. ("VWGOA"), d/b/a Audi of America, Inc. ("AOA"), and Audi AG ("Audi AG") (collectively "VW" or "Defendants") and allege the following:

<div align="center">

1

</div>

## INTRODUCTION

1.      This is a case about a massive fraud committed by VW. The facts of VW's criminal wrongdoing are not disputed by VW.

2.      For over a decade, starting as early as 2006, VW engineered a criminal conspiracy to defraud its dealers, such as Braman, the American consumer, and state and federal regulators. The fraud involved selling Audi-brand "clean diesel" turbo-charged direct ignition vehicles ("TDI") with a "defeat device" software. The software was engineered by VW to deceive emissions testers and regulators into believing that the TDI vehicles were actually complying with clean air regulatory limits, when, in fact, they were polluting the atmosphere at a rate far greater than the legal levels of emissions.

3.      On January 11, 2017, the U.S. Department of Justice ("DOJ") announced that VW had agreed to plead guilty, as a result of the TDI defeat device criminal scheme, to conspiracy to defraud the United States, commit wire fraud, and violate the Clean Air Act ("CAA"); obstruction of justice; and importing goods into the stream of U.S. commerce by false statement (the "Plea Agreement"). In the Plea Agreement VW stipulated to a Statement of Facts that sets forth the factual basis for its criminal wrongdoing and "agree[d] that it will neither contest the admissibility of, nor contradict, the Statement of Facts … in <u>any proceeding</u>." (Plea Agreement, Section 1E, page 7.[1]

4.      Once word of VW's criminal wrongdoing became public, Braman could no longer sell its stock of TDI vehicles, sold fewer Audi brand cars overall than it otherwise would have,

---

[1] A copy of the Plea Agreement and the Statement of Facts are attached hereto as Exhibit "A," and are incorporated herein by reference.

suffered a tarnished reputation to the Audi brand and damage to its overall value, and was left with unsalable inventory and dissatisfied customers.

5.      Braman sues VW for the damages caused by VW's criminal wrongdoing.

## Jurisdiction and Venue

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because one or more of the claims arise under the laws of the United States and pursuant to 28 U.S.C. § 1332 because the Plaintiffs and Defendants reside in different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial district and this State, and intentionally availed themselves of the laws of the United States and this State by conducting a substantial amount of business throughout this State, including the importation, distribution, testing, sale, lease and/or warranty of Audi vehicles in this State and District.  At least in part because of Defendants' misconduct as alleged herein, vehicles equipped with the 2.0L and 3.0L TDI engines (the "Subject Vehicles") have ended up on this State's roads and been sold and received in inventory at franchised Audi dealerships in this State.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Defendants' promotion, marketing, distribution and sale of the Subject Vehicles to Plaintiffs and other Audi dealers in this

District.  Defendants have dealerships located throughout this District where they sell a substantial number of motor vehicles.

<div align="center">

**PARTIES**

</div>

9.     WPB is a corporation organized and existing under the laws of the State of Florida, with its primary place of business located at 2101 Okeechobee Boulevard, West Palm Beach, Florida 33409.

10.     WPB is a licensed motor vehicle dealer authorized to do business in the State of Florida, and is a party to an Audi Dealer Sales and Service Agreement.

11.     WPB is an "interested party or person" as defined in Fla. Stat. § 501.203(6).

12.     At all times relevant to this Complaint, Braman Automotive, Inc., is a successor entity of Palm Beach Imports, Inc., with the succession effective on or about January 1, 2016.

13.     Prestige is a corporation organized and existing under the laws of the State of Florida, with its primary place of business located at 9201 W. Colfax Avenue, Denver Colorado 80215.

14.     Prestige is a licensed motor vehicle dealer authorized to do business in the State of Colorado, and is a party to an Audi Dealer Sales and Service Agreement.

15.     Prestige is an "interested party or person" as defined in Fla. Stat. § 501.203(6), and a "person" as defined in C.R.S.A. § 6-1-102(6).

16.     Defendant VWAG is a German corporation with its principal place of business in Wolfsburg, Germany.  VWAG designs, builds, and sells vehicles throughout the world, including throughout the United States and in this District.  VWAG is the parent corporation of VWGOA and Audi AG.

<div align="center">

4

</div>

17.     Defendant VWGOA is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in the Commonwealth of Virginia, and a wholly-owned subsidiary of VWAG.

18.     VWGOA has two unincorporated business divisions: Volkswagen of America, Inc. ("VWOA") and AOA.   AOA purchases Audi-brand vehicles from Audi AG and then imports, distributes, and sells these vehicles to franchised Audi dealers throughout the United States, including Braman.

19.     In 2016, AOA sold over 210,000 Subject Vehicles through its dealer network located throughout the United States, and promoted these vehicles to the public as being fuel-efficient and environmentally friendly while fun to drive.

20.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany, and a subsidiary of VWAG.

21.     VWAG and Audi AG developed the engines for the Subject Vehicles.

22.     VWAG, VWGOA, and Audi AG are the agents of each other and act in unison for their mutual profit.   Therefore, all acts and knowledge ascribed to VWAG, VWGOA, and Audi AG are properly imputed to the other.

23.     At all times relevant herein, VW manufactured, distributed, sold, leased, warranted and promoted the Subject Vehicles, with the illegal defeat devices, under the Audi brand name throughout the United States, including in this District.

## FACTUAL ALLEGATIONS

24.     The Statement of Facts outlines in detail the fraud perpetrated by VW.   Relevant portions of the Statement of Facts are included below.

A.     **The TDI Criminal Conspiracy.**

25.     The United States Government and individual states have passed laws and regulations designed to protect citizens from the harmful effects of air pollution.  Motor vehicle manufacturers and their related entities, including VW, must comply with these laws.

26.     The United States Government and individual states have also passed laws and regulations designed to curtail unfair and deceptive trade practices, which ultimately harm the public and impede commerce.  VW must also comply with these laws.

27.     The CAA and its regulations prohibit manufacturers of new motor vehicles and related entities from selling, offering for sale, introducing or delivering for introduction into U.S. commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle complies with U.S. emissions standards, including "NOx" emission standards, and is issued an EPA certificate of conformity.

28.     Motor vehicle manufacturers and other related entities cannot sell motor vehicles in the United States without a certificate of conformity from the EPA. One state, California, through the California Air Resources Board ("CARB"), also issues its own certificate, which are equal to or more stringent than those of the EPA. As part of the certification process, manufacturers often work in parallel with the EPA and CARB.

29.     VW sold, offered for sale, introduced into commerce, and/or imported into the United States, including Florida and Colorado, the following Audi vehicles containing 2.0 Liter TDI engines: Model Years ("MY") 2010-2013 and 2015 Audi A3 (the "2.0 Liter Subject Vehicles").

30.     VW sold, offered for sale, introduced into commerce, and/or imported into the United States, including Florida and Colorado, the following Audi vehicles containing 3.0 Liter

TDI engines:  MY 2009-2015 Audi Q7; MY 2014-2016 Audi A6 Quattro; MY 2014-2016 Audi A7 Quattro; MY 2014-2016 Audi A8L; and MY 2014-2016 Audi Q5 (the "3.0 Liter Subject Vehicles").

31.    VWAG developed the engines for the 2.0 Liter Subject Vehicles while Audi AG developed the engines for the 3.0 Liter Subject Vehicles (collectively "the Subject Vehicles").

32.    From approximately May 2006 to approximately November 2015, VW recognized that the only way its TDI vehicle engines could meet the required U.S. emission standards and attract sufficient customer demand in the U.S. market was through the use of a defeat device in the Subject Vehicles to detect, evade, and defeat U.S. emission standards, and it set out to deceive U.S. regulators and U.S. customers about whether the Subject Vehicles complied with U.S. emission standards.

33.    VW, at the direction from the highest level of management at various VW entities, and with the help of its suppliers and vendors, designed, created, and implemented the defeat device software.

34.    The defeat device recognized when a Subject Vehicle was undergoing U.S. emissions testing or whether it was being driven on the road under normal driving conditions. Depending on the scenario, the defeat device changed the Subject Vehicle's performance. When it was being tested, the device caused the vehicle to function in one mode, falsely satisfying the U.S. emission standards. But, if the defeat device detected that the vehicle was not being tested, it operated in another mode, in which the effectiveness of the vehicle's emissions systems was reduced substantially, causing the vehicle to emit substantially higher pollutants, sometimes 35 higher that U.S. standards.

35.     When concerned VW employees raised objections to the propriety of the defeat device, they were instructed by their supervisors to continue with the project and not to get caught, despite knowing that the only purpose of the defeat device was to pass U.S. emissions standards.

36.     At various times throughout the period of the fraudulent scheme, VW employees met with representatives of the EPA and CARB to obtain the certifications necessary to sell the Subject Vehicles.

37.     For each model year of the Subject Vehicles, VW employees represented to EPA and CARB representatives that the Subject Vehicles complied with the applicable standards when in fact they did not. Based on those representations, the EPA and the CARB issued the certificates allowing the Subject Vehicles to be sold in the United States.

38.     VW also represented to U.S. Customs and Border Protection ("CBP") that the Subject Vehicles conformed to EPA and CARB emissions regulations, allowing the Subject Vehicles to be imported into the United States.

39.     And, VW represented to its U.S. customers, U.S. Audi dealers, U.S. regulators and others in the United States that the Subject Vehicles met all applicable emissions standards.

40.     VW designed a specific marketing campaign to market the Subject Vehicles to customers throughout the United States, including those residing in Florida and Colorado, representing the Subject Vehicles as "clean diesel" vehicles.

41.     Braman relied on all the representations made by VW that the Subject Vehicles complied with all U.S. laws.

**B.      The Defendants' Deception Began to Unravel in 2015.**

42.     All of those representations, however, were intentionally false, and began to unravel slowly in 2014.

43.     On or around October 1, 2014, VW employees responded to CARB's questions about independent studies showing that 2.0 Liter Subject Vehicles emitted pollution in excess of regulatory limits.  In response, VW's employees did not admit that defeat devices were installed in the Subject Vehicles.  Instead, they attempted to obstruct the investigation and cover up the fraudulent scheme by blaming driving patterns and technical issues for the discrepancies.

44.     Facing the risk of having the Subject Vehicles would de-certified for sale in California and elsewhere in the United States, VW continued to conceal the presence of the defeat devices in meetings with the U.S. regulators.

45.     On or around January 27, 2015, CARB informed VW that it would not approve certification of the Model Year 2016 3.0 Liter Subject Vehicles until Audi AG confirmed that the 3.0 Liter Subject Vehicles did not possess the same emissions issues identified in independent studies of the 2.0 Liter Subject Vehicles.

46.     In a presentation to CARB, Audi AG employees did not disclose that these vehicles had defeat devices installed in them as well.  In fact, the 3.0 Liter Subject Vehicles had a defeat device installed that would be triggered when the vehicle was undergoing testing, just like the defeat device in the 2.0 Liter Subject Vehicles.

47.     Based on these knowingly false statements, CARB issued an executive order approving the sale of MY 2016 3.0 Liter Subject Vehicles.

48.     Finally, on or about August 19, 2015, a VW employee explained, for the first time to U.S. regulators and in contravention of instructions from supervisors at VWAG that certain of the 2.0 Liter Subject Vehicles performed differently for emissions-testing purposes based upon whether the vehicle was being tested or driven under normal circumstances.

49.     On September 18, 2015, the EPA issued a public Notice of Violation to VW stating that the EPA had determined that VW had violated the CAA by manufacturing and installing defeat devices in the 2.0 Liter Subject Vehicles.

50.     On September 18, 2015, the EPA announced that it was investigating VWGOA and its parent company VWAG for non-compliance with the CAA and its regulations. Those investigations ultimately also encompassed both of VWGOA's unincorporated business units, AOA and VWOA, as well as VWAG's subsidiary, Audi AG.

51.     The investigation eventually revealed that many Volkswagen, Audi and Porsche "clean diesel" vehicles manufactured by VW were actually polluting the atmosphere at many times the represented levels, and that VW had conspired to create a "defeat device" software installed in the Subject Vehicles that would fool emissions testers and regulators into believing the vehicles were actually within the legal limits.

52.     On or about November 2, 2015, EPA issued a Notice of Violation to VWAG and Audi AG, citing violations of the Clean Air Act related to the EPA's discovery that 3.0 Liter Subject Vehicles contained a defeat device that resulted in excess emissions when the vehicles were driven on the road.

53.     On or about November 2, 2015, VWAG issued a statement that "no software has been installed in the [3.0 Liter Subject Vehicles] to alter emissions characteristics in a forbidden manner."

54.     Soon thereafter, on or about November 19, 2015, Audi AG representatives admitted to the EPA that the 3.0 Liter Subject Vehicles did indeed have a defeat device installed on them.

55.     Prior to admitting to regulators the existence of defeat devices in the 2.0 Liter Subject Vehicles, employees of VWAG and Audi AG destroyed documents and files related to U.S.

emissions. Certain VWAG employees also requested their counterpart at other companies to destroy documents related to U.S. emissions issues.  The VWAG and Audi AG employees who participated in the destruction of the documents did so to protect both VW and themselves from the legal consequences of their actions All told, thousands of documents were deleted.

56.     VW profited from making false and misleading statements in violation of state and federal law by selling more Subject Vehicles than it would if the defeat devices did not exist.

57.     Indeed, VW admitted to the Justice Department that there was insufficient market demand to justify building a 2.0 Liter diesel engine that truly complied with applicable emission regulations.

58.     Investigations related to the TDI defeat device scheme show revealed that the criminal scheme described was known to and participated at the highest levels of VW.

59.     In or about July 2017, the former head of thermodynamics in Audi's engine development department was arrested in Germany as part of the U.S. investigation.  According to court documents released as part of the U.S. investigation, Audi engineers were the first to figure out how to use software to cloak the excess and unlawful emissions generated by TDI vehicles.

60.     On or about August 4, 2017, the former head of VW's environmental and engineering center in Michigan pled guilty to federal charges related to the TDI defeat device scheme, including conspiring with other VW employees to violate the CAA and defraud the United States.

**C.     While the TDI Conspiracy was Ongoing, AOA Pushed Braman to Invest Heavily in Its Audi Dealerships.**

61.     VW falsely marketed the Subject Vehicles as being environmentally friendly. Annexed hereto as Exhibit "B" is a representative sample of the type of advertising AOA used to promote the sale of the Subject Vehicles.

62.     These false and misleading public statements and advertisements spanned the entire period of the TDI criminal conspiracy until the scandal became public.

63.     Throughout that same period, the Subject Vehicles were sold to Braman and the consuming public at a premium in comparison to comparable vehicles not equipped with the TDI engines.

64.     During that same time period, AOA made false, misleading, and fraudulent representations to its Audi dealers in the United States, including Braman, to invest heavily in the Audi brand, and implemented coercive programs to shift costs and risks upon its dealers.

65.     One such program, implemented by AOA n 2008, was known as the "Margin and Bonus Program."

66.     This program forced the dealers to move from a "flat" unconditional margin on each vehicle sold to a system where vehicle profit margin became "tied" to conditions set unilaterally and arbitrarily by AOA.

67.     Typically, an Audi dealer's new vehicle profit margin was based on the difference between the selling price of the vehicle to the consumer and the vehicle's acquisition cost from AOA.  The difference between the selling price and the vehicle's acquisition cost is known as "gross profit."

68.     Prior to the Margin and Bonus Program, AOA had a standard "trading margin" earned virtually automatically.

69.     The Manufacturer's Suggested Retail Price ("MSRP") of a new vehicle functions as a form of price ceiling, with consumers unwilling to pay more than MSRP for a new vehicle, except in rare circumstances where demand greatly exceeds supply.  For example, assume a new

vehicle has an invoice cost of $45,000 and a MSRP of $50,000.  If the dealer sells the vehicle for the MSRP, the dealer will earn $5,000 in gross profit.

70.     With the implementation of the Margin and Bonus Program, AOA lowered the trading margin and gross profit for its dealers and shifted the costs and risks, which were historically borne by the manufacturer/distributor, to dealers.

71.     AOA provided so-called "incentives" through the Margin and Bonus Program only if the dealer met certain sales objectives and other AOA-determined conditions.  AOA would pay dealers these funds (that previously were obtainable without satisfying the new conditions) only if the dealer met specific conditions, including specific operating and facility requirements.

72.     AOA also coupled facility requirements under the Margin and Bonus Program with rosy projections of future Audi sales (including sales of TDI vehicles) to convince dealers to spend hundreds of millions of dollars on costly facility renovations.  In 2014, while AOA and other VW entities were perpetrating its TDI defeat device fraud, AOA boasted in the Automotive News, an industry publication, that Audi dealers had invested $1 billion in new or updated facilities.[2]

73.     AOA introduced these coercive changes in its relationship with its dealers ostensibly to improve customer satisfaction and to usher Audi dealers into a new era of higher sales and profits, all the while concealing that AOA and other VW entities were deceiving the public and its dealers regarding the TDI criminal scheme.

74.     In reliance on representations by AOA and the other Defendants that they were operating lawfully, Braman and other Audi Dealers invested heavily in Audi during this period,

---

[2]     "Boom Time for Audi Dealerships," Automotive News, October 6, 2014, http://www.autonews.com/article/20141006/RETAIL/310069967/boom-time-for-audi-dealerships, last visited May 9, 2017.

spending tens of millions of dollars in facility renovations and other upgrades to meet projected demand.

75.     As the Plea Agreement revealed, however, VW's representations were false.

**COUNT I**
**Breach of Contract (Florida Law)**
**(WPB against AOA)**

76.     WPB repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

77.     At all times material to this Complaint, WPB was a party to a Dealer Agreement with AOA.

78.     The Dealer Agreement incorporates several other documents by reference, including a set of "Standard Provisions."

79.     The Standard Provisions impose several affirmative obligations upon Audi, including an obligation to safeguard Audi's reputation and to conduct itself in an honest and ethical manner:

> In the conduct of its business, Audi will:
>
> (a)     Safeguard and promote the reputation of Authorized Products and the Manufacturer;
>
> (b)     Refrain from all conduct which might be harmful to the reputation or marketing of Authorized Products or inconsistent with the public interest; and
>
> (c)     Avoid all discourteous, deceptive, misleading, unprofessional or unethical practices.

Standard Provisions at Art. 1.

80.     AOA breached the Dealer Agreement by engaging in fraudulent, deceptive, misleading, unprofessional and unethical practices and engaged in conduct inconsistent with the

public interest by conspiring with the other Defendants to build, market and sell vehicles equipped with defeat devices.

81.     AOA engaged in further deceptive, misleading, unprofessional and unethical practices and engaged in conduct inconsistent with the public interest by collaborating with Defendants to keep the existence of the defeat devices secret as long as possible.

82.     AOA's breach of the Dealer Agreement is a direct and proximate cause of WPB's damages in an amount to be determined at trial.

WHEREFORE, WPB demands judgment against Defendants for the total amount of damages resulting from Defendants' breach of the Dealer Agreement, and such further and other relief as the Court deems just and proper.

**COUNT II**
**Violation of Fla. Stat. § 320.64(4)**
**(WPB against AOA)**

83.     WPB repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

84.     Fla. Stat. § 320.64(4) states, in pertinent part, that licensees are prohibited from indulging in any illegal act related to its business.

85.     AOA is a "licensee" under Florida law.

86.     VWGOA and AOA, through the Plea Agreement entered into by VW, has admitted to engaging in illegal acts.  AOA is used as a "dba" for VWGOA and therefore has, in fact and for all practical purposes related to this Complaint, admitted to participating in federal crimes relating to the TDI/defeat device fraud, including obstruction of justice.  The design, manufacture, marketing and sales of vehicles equipped with defeat devices is an illegal act related to AOA's business of building and selling motor vehicles.

15

87.     AOA also violated applicable state and federal laws by building and selling vehicles with defeat devices installed, which emitted far more pollutants than allowed by law.

88.     AOA's violation of Fla. Stat. § 320.64(4) is a direct and proximate cause of WPB's damages.

89.     WPB has been harmed by AOA's violation of Fla. Stat. § 320.64(4) by fraudulently induced investment, lost sales, lost profits, and the loss in value of its business, among other losses described herein.

90.     Fla. Stat. § 320.697 permits WPB to recover treble damages, costs and attorney's fees for AOA's violation of Fla. Stat. § 320.64(4).

WHEREFORE, WPB demands judgment against Defendants for the total amount of damages resulting from Defendants' violation of Florida Statutes § 320.64(4), treble damages, and such further and other relief as the Court deems just and proper.

<div style="text-align:center">

**COUNT III**
**Violation of Fla. Stat. § 320.64(12)**
**(WPB against AOA)**

</div>

91.     WPB repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

92.     Fla. Stat. § 320.64(12) prohibits licensees from advertising, printing, displaying, distributing, broadcasting, televising or causing or permitting to be advertised, printed, displayed, published, distributed, broadcast, or televised, in any manner whatsoever, any statement or representation with regard to the sale or financing of motor vehicles which is false, deceptive or misleading.

93.     AOA is a "licensee" under Florida law.

94.     VWGOA and AOA, through the Plea Agreement entered into by VW, has admitted to engaging in illegal acts.  AOA is used as a "dba" for VWGOA and therefore has, in fact and for all practical purposes related to this Complaint, admitted to participating in federal crimes relating to the TDI/defeat device fraud, including obstruction of justice.  These illegal acts include advertising that the Subject Vehicles were fuel efficient, environmentally friendly, and were in compliance with applicable law when in fact they were not.

95.     AOA's violation of Fla. Stat. § 320.64(12) is a direct and proximate cause of WPB's damages.

96.     WPB has been harmed by AOA's violation of Fla. Stat. § 320.64(12) by fraudulently induced investment, lost sales, lost profits, and the loss in value of its business, among other losses described herein.

97.     Fla. Stat. § 320.697 permits WPB to recover treble damages, costs and attorney's fees for AOA's violation of Fla. Stat. § 320.64(12).

WHEREFORE, WPB demands judgment against Defendants for the total amount of damages resulting from Defendants' violation of Florida Statutes § 320.64(12), treble damages, and such further and other relief as the Court deems just and proper.

## COUNT IV
### Violation of Fla. Stat. § 501.201 *et seq* ("FDUTPA").
### (WPB against all Defendants)

98.     WPB repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

99.     Defendants have engaged in deceptive and unfair trade practices under Fla. Stat. § 501.201 *et seq.*, including, without limitation, by: (a) publishing lies to the public in false advertisements, including those in Exhibit B; (b) enhancing their lies with additional statements to

the public touting that vehicles equipped with TDI engines were environmentally friendly and compliant; (c) concealing the true nature of the TDI engines while making false claims to the public and Audi dealer body; and (d) making deliberate, false statements to the public and Audi dealer body in order to capture more business for itself.

100.    Defendants' deceptive and unfair trade practices is the direct and proximate cause of damages to WPB.

101.    Defendants are liable for enhanced damages and attorney's fees under Fla. Stat. § 501.2105.

WHEREFORE, WPB demands judgment against Defendants for the total amount of damages resulting from Defendants' violation of the Florida Deceptive and Unfair Trade Practices Act Statutes, enhanced damages, and such further and other relief as the Court deems just and proper.

## COUNT V
## Fraudulent Concealment (Florida Law)
## (WPB against all Defendants)

102.    WPB repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

103.    AOA and the other Defendants intentionally concealed from the public, WPB and regulators that it installed defeat devices on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles.

104.    AOA and the other Defendants intentionally concealed from the public, WPB, and regulators (a) that this fraud spanned several years, (b) that AOA and the other Defendants actively engaged in deception to cover up the fraud, and (c) that AOA and the other Defendants actively

18

engaged in actions to perpetuate the fraud, including periodic updates to the software of the defeat device to make it better at cheating on emissions tests.

105.    The above described information was highly relevant to WPB with respect to its decisions to invest in the Audi brand, expand Audi operations, invest in special tools, training and equipment to sell Subject Vehicles, and offer Subject Vehicles for sale to the public.

106.    WPB would not have purchased or sold vehicles that did not comply with applicable law but for AOA's assurances that the vehicles conformed to applicable state and federal standards.

107.    Relying on AOA's promises that its vehicles complied with applicable law, WPB represented to the public that the Subject Vehicles meet safety and emission standards, and were fuel efficient without sacrificing performance.

108.    As outlined in the Plea Agreement, VW as a whole, including AOA, acted with intent and malice to keep the fraud secret from the public and dealers.

109.    AOA's fraudulent concealment was a direct and proximate cause of WPB's losses; and WPB also is entitled to punitive damages as a result of AOA's and VW's conduct.

WHEREFORE, WPB demands judgment against Defendants for the total amount of damages resulting from Defendants' fraudulent concealment, punitive damages, and such further and other relief as the Court deems just and proper.

**COUNT VI**
**Breach of Contract (Colorado Law)**
**(Prestige against AOA)**

110.    Prestige repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

111.    At all times material to this Complaint, Prestige was a party to a Dealer Agreement with AOA.

112.    The Dealer Agreement incorporates several other documents by reference, including a set of "Standard Provisions."

113.    The Standard Provisions impose several affirmative obligations upon AOA, including an obligation to safeguard Audi's reputation and to conduct itself in an honest and ethical manner:

> In the conduct of its business, Audi will:
>
> (a)    Safeguard and promote the reputation of Authorized Products and the Manufacturer;
>
> (b)    Refrain from all conduct which might be harmful to the reputation or marketing of Authorized Products or inconsistent with the public interest; and
>
> (c)    Avoid all discourteous, deceptive, misleading, unprofessional or unethical practices.

Standard Provisions at Art. 1.

114.    AOA breached the Dealer Agreement by engaging in fraudulent, deceptive, misleading, unprofessional and unethical practices and engaging in conduct inconsistent with the public interest by conspiring with the other Defendants to build, market and sell vehicles equipped with defeat devices.

115.    VWGOA and AOA, through the Plea Agreement entered into by VW, has admitted to engaging in illegal acts.  AOA is used as a "dba" for VWGOA and therefore has, in fact and for all practical purposes related to this Complaint, admitted to participating in federal crimes relating to the TDI/defeat device fraud, including obstruction of justice.

116.    The installation and selling of vehicles equipped with defeat devices violated state and federal environmental laws.

117.    AOA engaged in further deceptive, misleading, unprofessional and unethical practices and engaged in conduct inconsistent with the public interest by collaborating with Defendants to keep the existence of the defeat devices secret as long as possible.

118.    AOA's deceptive, unprofessional, and unethical practices and conduct damaged Prestige.

119.    AOA's breach of the Dealer Agreement is a direct and proximate cause of Prestige's damages in an amount to be determined at trial.

WHEREFORE, Prestige demands judgment against Defendants for the total amount of damages resulting from Defendants' breach of the Dealer Agreement, and such further and other relief as the Court deems just and proper.

## COUT VII
### Violation of Colorado Consumer Protection Act, C.R.S.A. § 6-1-101 *et seq.*
### (Prestige against all Defendants)

120.    Prestige repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

121.    AOA and the other Defendants have engaged in deceptive and unfair trade practices under C.R.S.A. § 6-1-101 *et seq.*, including, without limitation, by: (a) publishing lies to the public in false advertisements, including those in Exhibit B; (b) enhancing their lies with additional statements to the public touting that vehicles equipped with TDI engines were environmentally friendly and compliant; (c) concealing the true nature of the TDI engines while making false claims to the public and Audi dealer body; and (d) making deliberate, false statements to the public and Audi dealer body in order to capture more business for itself.

122.    AOA and the other Defendants engaged in the deceptive and unfair trade practices in the course of their business of promoting the sale of Audi-brand motor vehicles to residents of Colorado.

123.    Defendants' deceptive and unfair trade practices significantly impacted the public as actual or potential customers of the Defendants' vehicles, including, without limitation: (a) inducing consumers and dealers to purchase vehicles that did not perform as promised; (b) inducing consumers and dealers to purchase vehicles that exceeded applicable limits on emissions, in violation of state and federal law; and (c) deceiving the public and dealers through advertisements containing false and misleading statements while covering up their fraud and illegal activity.

124.    Prestige suffered injury in fact to its legally protected interests of being a franchised Audi dealer, authorized to sell and service Audi vehicles in Colorado.

125.    Defendants are liable for enhanced damages and attorney's fees under C.R.S.A. §§ 6-1-113(2)(a)(III) and 6-1-113(2)(b).

WHEREFORE, Prestige demands judgment against Defendants for the total amount of damages resulting from Defendants' breach of the Colorado Consumer Protection Act, enhanced damages, attorneys' fees, and such further and other relief as the Court deems just and proper.

### COUNT VIII
### Fraudulent Concealment (Colorado Law)
### (Prestige against all Defendants)

126.    Prestige repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

127.    AOA intentionally concealed from the public, Prestige and regulators that it installed defeat devices on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles.

128.    AOA intentionally concealed from the public, Prestige and regulators that this fraud spanned several years, that it actively engaged in deception to cover up the fraud, and actively engaged in actions to perpetuate the fraud, including periodic updates to the software of the defeat device to make it better at cheating on emissions tests.

129.    This information was highly relevant to Prestige with respect to its decisions to invest in the Audi brand, expand Audi operations, invest in special tools, training and equipment to sell the Subject Vehicles, and to offer the Subject Vehicles for sale to the public.

130.    Prestige would not have purchased or sold vehicles that did not comply with applicable law but for AOA's assurances that the vehicles conformed to applicable state and federal standards.

131.    Relying on AOA's promises that its vehicles complied with applicable law, Prestige represented to the public that the Subject Vehicles meet safety and emission standards, and were fuel efficient without sacrificing performance.

132.    As outlined in the Plea Agreement, VW as a whole, including AOA, acted with intent and malice to keep the fraud secret from the public and dealers.

133.    AOA's fraudulent concealment was a direct and proximate cause of Prestige's losses, and Prestige is entitled to punitive damages as a result.

WHEREFORE, Prestige demands judgment against Defendants for the total amount of damages resulting from Defendants' fraudulent concealment, punitive damages, and such further and other relief as the Court deems just and proper.

**COUNT IX**
**Violations of Racketeer Influenced and**
**Corrupt Organizations Act (Civil RICO) 18 U.S.C. § 1962**
<u>**(WPB and Prestige against all Defendants)**</u>

134.    WPB and Prestige repeat and re-allege each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

135.    From in or about 2006 through in or about 2015, each Defendant, along with non-party entities (collectively, the "Diesel Defeat Enterprise"), conspired to commit wire fraud, mail fraud, securities fraud, money laundering, and otherwise to defraud the United States, all in violation of federal law.  The Diesel Defeat Enterprise used means of interstate commerce, including mail and electronic correspondences to communicate with regulators, Audi dealers and the public.

136.    From in or about 2006 through in or about 2015, the Diesel Defeat Enterprise promoted the purported efficiency of their products through means of interstate commerce, including national television advertising, print advertising, and advertising on the Internet.

137.    The communications described herein were made in furtherance of perpetuating their fraud by concealing the existence of diesel defeat devices on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles, and hiding the true emissions performance of these vehicles.

138.    The members of the enterprise include, among others known and unknown: Defendants VWAG, Audi AG, AOA, VWGOA, and non-parties.

139.    The Diesel Defeat Enterprise conspired to deceive regulators, the public, and Audi dealers, representing that the Subject Vehicles emitted far less harmful pollutants than they actually did.

140.    For years, the Diesel Defeat Enterprise deceived regulators and misled the public, and Audi dealers regarding the fraud alleged herein.  Once the Diesel Defeat Enterprise faced

multiple governmental investigations, members of the enterprise made the deliberate decision to obstruct the investigations.  Instead, the Diesel Defeat Enterprise did everything it could to perpetuate the fraud and deceive the public, the dealers and regulators.

141.    VW has admitted that it could not build a diesel engine that actually met emission standards that would also be desirable to consumers and meet the demands of the market.  Instead of doing the right thing and complying with the law, VW chose to install the defeat devices with the help of non-parties.  This fraud lasted for years and benefited both VW and non-parties with higher sales than they would have otherwise received.

142.    As stated in the Plea Agreement, VW knew what it was doing, and actually performed a calculus of risk and reward with respect to the criminal conduct.  Ignoring the harm it was doing to the environment, it opted to risk getting caught and pay some fines instead of fully disclosing its fraud.

143.    From in or about 2008 until in or about 2015, VWGOA/AOA imported illegally-equipped Audi brand "clean diesel" vehicles into the United States, and made false statements to Customs and Border Patrol in order to do so.

144.    To carry out or to attempt to carry out its scheme to defraud, each Defendant conducted or participated in the conduct of the affairs of the Diesel Defeat Enterprise through a pattern of racketeering activity that engaged in money laundering, in violation of 18 U.S.C. §§ 1956, 1957, and employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

145.    More specifically, each Defendant participated in the scheme to defraud by using mail, telephone and the Internet to transmit writings travelling in interstate or foreign commerce.

146.   The Diesel Defeat Enterprise's use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by members of the Diesel Defeat Enterprise or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

    a.  application for certificates submitted to the EPA and CARB and Approved Applications received in the mail;

    b.  applications submitted to the EPA and CARB for each Audi vehicle model year as follows (the "Subject Vehicles"):

- Audi A3 (Model Years 2010-2013, 2015)

- Audi A6 Quattro (Model Years 2014-2016)

- Audi A7 Quattro (Model Years 2014-2016)

- Audi A8 (Model Years 2014-2016)

- Audi A8L (Model Years 2014-2016)

- Audi Q5 (Model Years 2014-2016)

- Audi Q7 (Model Years 2009-2015)

    c.  the Subject Vehicles themselves;

    d.  component parts for the defeat devices;

    e.  essential hardware for the Subject Vehicles;

    f.  falsified emissions tests;

    g.  fraudulently-obtained EPA COCs and CARB Eos;

    h.  vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

    i.  documents and communications that facilitated the falsified emission tests;

    j.  false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

k.  sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Subject Vehicles;

l.  documents intended to facilitate the manufacture and sale of the Subject Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

m.  documents to process and receive payment for the Subject Vehicles by unsuspecting Audi dealers, including invoices and receipts;

n.  payments to non-parties;

o.  deposits of proceeds; and

p.  other documents and things, including electronic communications.

147.    The Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Affected Vehicles and related documents by mail or a private carrier affecting interstate commerce.

148.    The Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds related to the items listed in paragraph 164 above.

149.    The Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

150.    The Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, AOA, under the direction and control of VWAG, Audi AG, and their executives, made misrepresentations about the Affected Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead

regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

151.    The Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

152.    Each Defendant has committed two or more predicate acts.

153.    The predicate acts by each of the Defendants, taken together, illustrate a years-long pattern of designing and redesigning the defeat devices, to be installed across many model years and models of Audi-brand vehicles, each of which could only be imported after false and deceptive statements were made the United States Government, and thereby constitutes a pattern and practice of racketeering activity.

154.    Together, the Defendants and non-parties engaged in a criminal enterprise, the object of which was to import and sell fraudulently documented and illegal "clean diesel" Audi vehicles in the United States.

155.    As many thousands of Audi-brand vehicles with illegal defeat devices were imported, distributed, and sold in the United States, the Defendants' criminal enterprise affected interstate commerce.

156.    Braman was damaged by the criminal conspiracy by, among other things: (i) purchasing and selling non-conforming vehicles it would otherwise not purchase or sell; (ii) having to keep unsalable vehicles in inventory during the pendency of the EPA's stop-sale on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles; (iii) loss of customer goodwill caused by Defendant's fraud and misrepresentations to the public; (iv) loss of related service, parts and aftersales income from lost sales to the public; (v) fraudulently induced investment in the brand

based on VW's representations with respect to future viability of the Audi brand and expected sales growth from diesel equipped vehicles; (vi) lost profits; (vii) damage to the Braman brand(s) and Audi brand; and (viii) loss of value of Braman's Audi dealerships as going concerns.

157.    Defendants' violations of Civil RICO are the direct and proximate cause of the harm caused to Braman.

158.    In addition to equitable relief, 18 U.S.C. § 1964(c) permits recovery of treble damages, costs and reasonable attorney's fees.

159.    Braman was damaged by the criminal conspiracy by the diminution in value of their respective businesses and lost sales resulting in the Defendants' unlawful enterprise.  Each member of the enterprise knew, understood, and foresaw this harm once the public learned of the extent of their unlawful conduct.

WHEREFORE, Braman demands treble damages and attorneys' fees, and such other relief as the Court deems just and proper.

**COUNT X**
**Violations of Florida Civil Remedies for**
**Criminal Practices Act (Florida Civil RICO) F.S.A. § 772.101 *et seq*.**
**(WPB against all Defendants)**

160.    WPB repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

161.    From in or about 2006 through in or about 2015, each Defendant, along with non-party entities (collectively, the "Diesel Defeat Enterprise"), conspired to commit wire fraud, mail fraud, securities fraud, money laundering, and otherwise to defraud the United States, all in violation of federal law.  The Diesel Defeat Enterprise used means of interstate commerce, including mail and electronic correspondences to communicate with regulators, Audi dealers and the public.

162.    From in or about 2006 through in or about 2015, the Diesel Defeat Enterprise promoted the purported efficiency of their products through means of interstate commerce, including national television advertising, print advertising, and advertising on the Internet, all of which reached into the State of Florida.

163.    The communications described herein were made in furtherance of perpetuating their fraud by concealing the existence of diesel defeat devices on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles, and hiding the true emissions of these vehicles.

164.    The members of the enterprise include, among others known and unknown: Defendants VWAG, Audi AG, AOA, VWGOA, and non-parties.

165.    The Diesel Defeat Enterprise conspired to deceive regulators, the public, and Audi dealers, representing that the Subject Vehicles emitted far less harmful pollutants than they actually did.

166.    For years, the Diesel Defeat Enterprise deceived regulators and misled the public, and Audi dealers regarding the fraud alleged herein.  Once the Diesel Defeat Enterprise faced multiple governmental investigations, members of the enterprise made the deliberate decision to obstruct the investigations.  Instead, the Diesel Defeat Enterprise did everything it could to perpetuate the fraud and deceive the public, the dealers and regulators.

167.    VW admits that it could not build a diesel engine that actually met emission standards that would also be desirable to consumers and meet the demands of the market.  Instead of doing the right thing and complying with the law, it chose to install the defeat devices with the help of non-parties.  This fraud lasted for years and benefited both VW and non-parties with higher sales than they would have otherwise received.

168.   As stated in the Plea Agreement, VW knew what it was doing, and actually performed a calculus of risk and reward with respect to the criminal conduct.  Ignoring the harm it was doing to the environment, it opted to risk getting caught and pay some fines instead of fully disclosing its fraud.

169.   From in or about 2008 until in or about 2015, VWGOA/AOA imported illegally-equipped Audi brand "clean diesel" vehicles into the United States, and specifically into the State of Florida, and made false statements to Customs and Border Patrol in order to do so.

170.   To carry out or to attempt to carry out its scheme to defraud, each Defendant conducted or participated in the conduct of the affairs of the Diesel Defeat Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), which qualifies as "criminal activity" under F.S.A. § 772.102(1)(b).

171.   Specifically, each Defendant participated in the scheme to defraud by using mail, telephone and the Internet to transmit writings travelling in interstate or foreign commerce.

172.   The Diesel Defeat Enterprise's use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by members of the Diesel Defeat Enterprise or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

    a.   application for certificates submitted to the EPA and CARB and Approved Applications received in the mail;

    b.   applications submitted to the EPA and CARB for each model year as follows (the "Subject Vehicles"):

- Audi A3 (Model Years 2010-2013, 2015)

- Audi A6 Quattro (Model Years 2014-2016)

- Audi A7 Quattro (Model Years 2014-2016)

- Audi A8 (Model Years 2014-2016)

- Audi A8L (Model Years 2014-2016)

- Audi Q5 (Model Years 2014-2016)

- Audi Q7 (Model Years 2009-2015)

c.  the Subject Vehicles themselves;

d.  component parts for the defeat devices;

e.  essential hardware for the Subject Vehicles;

f.  falsified emissions tests;

g.  fraudulently-obtained EPA COCs and CARB Eos;

h.  vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

i.  documents and communications that facilitated the falsified emission tests;

j.  false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

k.  sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Subject Vehicles;

l.  documents intended to facilitate the manufacture and sale of the Subject Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

m. documents to process and receive payment for the Subject Vehicles by unsuspecting Audi dealers, including invoices and receipts;

n.  payments to non-parties;

o.  deposits of proceeds; and

p.  other documents and things, including electronic communications.

173.    The Defendants (or their agents), for the purpose of executing the illegal scheme,

sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier,

shipments of the Subject Vehicles and related documents by mail or a private carrier affecting interstate commerce, which reached into the State of Florida.

174.     The Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds related to the items listed in paragraph 190 above.

175.     The Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

176.     The Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, AOA, under the direction and control of VWAG, Audi AG, and their executives, made misrepresentations about the Subject Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics, which were also accessed by citizens of the state of Florida.

177.     The Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

178.     Each Defendant has committed two or more predicate acts.

179.     The predicate acts by each of the Defendants, taken together, illustrate a years-long pattern of designing and redesigning the defeat devices, to be installed across many model years and models of Audi-brand vehicles, each of which could only be imported after false and deceptive

statements were made the United States Government, and thereby constitutes a pattern and practice of racketeering activity.

180.    Together, the Defendants and non-parties engaged in a criminal enterprise, the object of which was to import and sell fraudulently documented and illegal "clean diesel" Audi vehicles in the United States.

181.    As many thousands of Audi-brand vehicles with illegal defeat devices were imported, distributed, and sold in the United States, the Defendants' criminal enterprise affected interstate commerce.

182.    WPB was damaged by the criminal conspiracy by, among other things: (i) purchasing and selling non-conforming vehicles it would otherwise not purchase or sell; (ii) having to keep unsalable vehicles in inventory during the pendency of the EPA's stop-sale on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles; (iii) loss of customer goodwill caused by Defendant's fraud and misrepresentations to the public; (iv) loss of related service, parts and aftersales income from lost sales to the public; (v) fraudulently induced investment in the brand based on VW's representations with respect to future viability of the Audi brand and expected sales growth from diesel equipped vehicles; (vi) lost profits; (vii) damage to the Braman brand(s) and Audi brand; and (viii) loss of value of WPB's Audi dealership as a going concern.

183.    Defendants' violations of Florida Civil RICO are the direct and proximate cause of the harms caused to WPB.

184.    In addition to equitable relief, F.S.A. § 772.104 permits recovery of treble damages, costs and reasonable attorney's fees.

185.     WPB was damaged by the criminal conspiracy by the diminution in value of its business, fraudulently induced investment, and lost sales and profits resulting in the Defendants' unlawful enterprise.  Each member of the enterprise knew, understood, and foresaw these harms.

WHEREFORE, WPB demands treble damages and attorneys' fees, and such other relief as the Court deems just and proper.

### COUNT XI
### Violations of Colorado Organized Crime Control Act
### (Colorado Civil RICO) Colo. Rev. Stat. Ann. § 18-17-101 *et seq.*
### (Prestige against all Defendants)

186.     Prestige repeats and re-alleges each of the foregoing paragraphs 1 through 75 as if fully set forth herein.

187.     From in or about 2006 through in or about 2015, each Defendant, along with non-parties (collectively, the "Diesel Defeat Enterprise"), conspired to commit wire fraud, mail fraud, securities fraud, money laundering, and otherwise to defraud the United States, all in violation of federal law.  The Diesel Defeat Enterprise used means of interstate commerce, including mail and electronic correspondences to communicate with regulators, Audi dealers and the public.

188.     From in or about 2006 through in or about 2015, the Diesel Defeat Enterprise promoted the purported efficiency of their products through means of interstate commerce, including national television advertising, print advertising, and advertising on the Internet, all of which reached into the State of Colorado.

189.     The communications described herein were made in furtherance of perpetuating their fraud by concealing the existence of diesel defeat devices on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles, and hiding the true emissions of these vehicles.

190.     The members of the enterprise include, among others known and unknown: Defendants VWAG, Audi AG, AOA, VWGOA, and non-parties.

191.    The Diesel Defeat Enterprise conspired to deceive regulators, the public, and Audi dealers, representing that the Subject Vehicles emitted far less harmful pollutants than they actually did.

192.    For years, the Diesel Defeat Enterprise deceived regulators and misled the public, and Audi dealers regarding the fraud alleged herein.  Once the Diesel Defeat Enterprise faced multiple governmental investigations, members of the enterprise made the deliberate decision to obstruct the investigations.  Instead, the Diesel Defeat Enterprise did everything it could to perpetuate the fraud and deceive the public, the dealers and regulators.

193.    VW admits that it could not build a diesel engine that actually met emission standards that would also be desirable to consumers and meet the demands of the market.  Instead of doing the right thing and complying with the law, it chose to install the defeat devices with the help of non-parties.  This fraud lasted for years and benefited both VW and non-parties with higher sales than they would have otherwise received.

194.    As stated in the Plea Agreement, VW knew what it was doing, and actually performed a calculus of risk and reward with respect to the criminal conduct.  Ignoring the harm it was doing to the environment, it opted to risk getting caught and pay some fines instead of fully disclosing its fraud.

195.    From in or about 2008 until in or about 2015, VWGOA/AOA imported illegally-equipped Audi brand "clean diesel" vehicles into the United States, and specifically into the State of Colorado, and made false statements to Customs and Border Patrol in order to do so.

196.    To carry out or to attempt to carry out its scheme to defraud, each Defendant conducted or participated in the conduct of the affairs of the Diesel Defeat Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18

U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), which qualifies as "racketeering activity" under Colo. Rev. Stat. Ann. § 18-17-103(5)(a).

197.    Specifically, each Defendant participated in the scheme to defraud by using mail, telephone and the Internet to transmit writings travelling in interstate or foreign commerce.

198.    The Diesel Defeat Enterprise's use of the mails and wires included, but were not limited to, the transmission, delivery, or shipment of the following by members of the Diesel Defeat Enterprise or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

    a.    application for certificates submitted to the EPA and CARB and Approved Applications received in the mail;

    b.    applications submitted to the EPA and CARB for each model year as follows (the "Subject Vehicles"):

- Audi A3 (Model Years 2010-2013, 2015)

- Audi A6 Quattro (Model Years 2014-2016)

- Audi A7 Quattro (Model Years 2014-2016)

- Audi A8 (Model Years 2014-2016)

- Audi A8L (Model Years 2014-2016)

- Audi Q5 (Model Years 2014-2016)

- Audi Q7 (Model Years 2009-2015)

    c.    the Subject Vehicles themselves;

    d.    component parts for the defeat devices;

    e.    essential hardware for the Subject Vehicles;

    f.    falsified emissions tests;

    g.    fraudulently-obtained EPA COCs and CARB Eos;

h.  vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

i.  documents and communications that facilitated the falsified emission tests;

j.  false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

k.  sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Subject Vehicles;

l.  documents intended to facilitate the manufacture and sale of the Subject Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

m.  documents to process and receive payment for the Subject Vehicles by unsuspecting Audi dealers, including invoices and receipts;

n.  payments to non-parties;

o.  deposits of proceeds; and

p.  other documents and things, including electronic communications.

199.    The Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Subject Vehicles and related documents by mail or a private carrier affecting interstate commerce, which reached into the State of Colorado.

200.    The Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds related to the items listed in paragraph 216 above.

201.    The Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

202.    The Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, AOA, under the direction and control of VWAG, Audi AG, and their executives, made misrepresentations about the Subject Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics, which were also accessed by citizens of the state of Colorado.

203.    The Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

204.    Each Defendant has committed two or more predicate acts.

205.    The predicate acts by each of the Defendants, taken together, illustrate a years-long pattern of designing and redesigning the defeat devices, to be installed across many model years and models of Audi-brand vehicles, each of which could only be imported after false and deceptive statements were made the United States Government, and thereby constitutes a pattern and practice of racketeering activity.

206.    Together, the Defendants and non-parties engaged in a criminal enterprise, the object of which was to import and sell fraudulently documented and illegal "clean diesel" Audi vehicles in the United States.

207.    As many thousands of Audi-brand vehicles with illegal defeat devices were imported, distributed, and sold in the United States, the Defendants' criminal enterprise affected interstate commerce.

208.    Prestige was damaged by the criminal conspiracy by, among other things: (i) purchasing and selling non-conforming vehicles it would otherwise not purchase or sell; (ii) having

to keep unsalable vehicles in inventory during the pendency of the EPA's stop-sale on 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles; (iii) loss of customer goodwill caused by Defendant's fraud and misrepresentations to the public; (iv) loss of related service, parts and aftersales income from lost sales to the public; (v) fraudulently induced investment in the brand based on VW's representations with respect to future viability of the Audi brand and expected sales growth from diesel equipped vehicles; (vi) lost profits; (vii) damage to the Braman brand(s) and Audi brand; and (viii) loss of value of Prestige's Audi dealership as a going concern.

209.    Defendants' violations of Florida Civil RICO are the direct and proximate cause of the harms caused to Prestige.

210.    In addition to equitable relief, Colo. Rev. Stat. Ann. § 18-17-106(7) permits recovery of treble damages, costs and reasonable attorney's fees.

211.    Prestige was damaged by the criminal conspiracy by the diminution in value of its business, fraudulently induced investment, and lost sales and profits resulting in the Defendants' unlawful enterprise.  Each member of the enterprise knew, understood, and foresaw these harms.

WHEREFORE, Prestige demands treble damages and attorneys' fees, and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand trial by jury in this

action of all issues so triable.

Dated: September 5, 2017

<div style="margin-left:40%">

Respectfully submitted,

**COLSON HICKS EIDSON, P.A**
255 Alhambra Circle
Coral Gables, FL 33134
Tel: (305) 476-7000

By: _Roberto Martínez_
Roberto Martínez
Florida Bar # 305596
bob@colson.com
Lindsey Lazopolous Friedman
Florida Bar #091792
lindsey@colson.com

*Attorneys for Plaintiffs*

</div>

Of Counsel:

Russell P. McRory (*pro hac vice forthcoming*)
Michael P. McMahan (*pro hac vice forthcoming*)
Charles A. Gallaer (Florida Bar # 117729)
Arent Fox LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3942
Fax: (212) 484-3990
russell.mcrory@arentfox.com
michael.mcmahan@arentfox.com
charles.gallaer@arentfox.com

David S. Leibowitz
General Counsel
Braman Management Association
2060 Biscayne Blvd, Second Floor
Miami, FL 33137
davidl@bramanmanagement.com